1

2   UNITED STATES DISTRICT COURT
    DISTRICT OF NEW JERSEY
3   Civil Action No. 08-4397 RECEIVED

4                                          DEC 1 2 2008

5   ------------------------------     AT 8:30_____M
                                       WILLIAM T. WALSH
6   In Regard to the Matter of:            CLERK

7   Bayside State Prison              OPINION/REPORT
    Litigation                          OF THE
8                                     SPECIAL MASTER
    JEROME SPRINGER

9              -vs-

10  WILLIAM H. FAUVER, et al,

11           Defendants.

12  ------------------------------

13

14

15                  *       *       *       *

16            TUESDAY, NOVEMBER 18, 2008

17                  *       *       *       *

18

19

20

21

22  BEFORE THE HONORABLE JOHN W. BISSELL, SPECIAL MASTER

23

24

25

1

2          Transcript of proceedings in the above

3    matter taken by Theresa O. Mastroianni, Certified

4    Court Reporter, license number 30X100085700, and

5    Notary Public of the State of New Jersey at the

6    United States District Court House, One Gerry Plaza,

7    Camden, New Jersey, 08102, commencing at 1:25 PM.

8

9

10

11

12

13

14

15

16          **MASTROIANNI & FORMAROLI, INC.**

17     **Certified Court Reporting & Videoconferencing**

18          **251 South White Horse Pike**

19          **Audubon, New Jersey 08106**

20          **856-546-1100**

21

22

23

24

25

1

2    **A P P E A R A N C E S:**

3

4

5        ROSELLI & GRIEGEL, PC
         BY:   JAMES LAZZARO ESQUIRE
6        1337 STATE HIGHWAY 33
         HAMILTON SQUARE, NEW JERSEY   08690
7        609-586-2257
         ATTORNEYS FOR THE DEFENDANTS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    JUDGE BISSELL:   At this point I'm

2    reopening proceedings in the case of Jerome Springer,

3    S-P-R-I-N-G-E-R, docket number 08-4397.

4                    This opinion/report is being issued

5    pursuant to the directives of Order of Reference to a

6    Special Master and the Special Master's Agreement and

7    the guiding principles of law which underlie this

8    decision to be applied to the facts upon which it is

9    based as set forth in the jury instructions in the

10   Walker and Mejias jury charges to the extent

11   applicable to the allegations of Mr. Springer.

12                    As finalized after review under Local

13   Civil Rule 52.1, this transcript will constitute the

14   written report required under paragraph seven of the

15   Order of Reference to a Special Master.

16                    Mr. Springer was on A Unit on or about

17   August 2nd, 1997 when the events that happened to him

18   occurred.  And in this case I find that he has

19   established the events as he's described them.

20                    By way of a little background, within

21   some two to three weeks preceding and leading up to

22   August 2nd he had had operations for two hernias, one

23   of them in the groin area and the other in the area

24   of his belly button and was still experiencing

25   discomfort, still had stitches in place and was also

1    needing changes of bandages in that time period.  The

2    record in this matter including contemporaneous

3    documents regarding his treatment establishes that.

4              I find that Mr. Springer's recounting

5    of the events that occurred to him which appears on

6    his direct examination beginning at page 113 of the

7    transcript of September 30, 2008 was credible.

8    Rather than try to be too selective there at the risk

9    of perhaps taking some time, I'm going to read it at

10   length.

11             He's asked to describe the surgery

12   which took place earlier.  He said:

13             "I had two hernias, one in the

14   umbilical cord and the other in the lower -- in

15   between my legs.

16             "Question:  So at some point after the

17   surgery you were sent back to Bayside?

18             "Answer:  Yes.

19             "Question:  And do you know if the

20   officers at Bayside were aware of your situation and

21   the recent surgery?

22             "Answer:  Yes.

23             "Question:  How do you know?

24             "Answer:  Because when I came in, I

25   couldn't walk and you could see I still had big

1    patches on me that was kind of red.

2              "Question:  You said big patches.

3    Where?

4              "Answer:  I had a patch on my stomach.

5    All I could wear was an undershirt because it was

6    still leaking.

7              "Question:  And were the patches

8    obvious or were they in an area where they could be

9    seen?

10             "Answer:  Yes, because I had an

11   undershirt on, you could see it right through the

12   undershirt.

13             "Question:  Let's talk about that

14   night.  You said you were on the bottom bunk?

15             "Answer:  Yes.

16             "Question:  SOG arrived at your unit?

17             "Answer:  Yes.

18             "Question:  What happened after?

19             "Answer:  They told me to get under the

20   bunk.  I couldn't even get off the bunk.

21             "Question:  What did you do?

22             "Answer:  I tried to explain to them,

23   look, I just had surgery.  I'll try to get off the

24   bunk.  The man didn't care.  He snatched me by the

25   back of the shirt and throw me out the room to the

1   post.

2              "Question:   Onto the post?

3              "Answer:   Yeah, there was a post right

4   in front of my door, like a corner, a post right

5   there.

6              "Question:   Describe it.

7              "Answer:   A beam.

8              "Question:   A beam?

9              "Answer:   A beam.

10             "Question:   Tell me how you were

11  thrown.

12             "Answer:   Head first out the door:

13             "Question:   And what part of your body

14  struck the post?

15             "Answer: My head -- when I hit, I hit

16  flush, my head just went right up on it.   I slid

17  right up on it and then slid down the wall.

18             "Question:   Did you hit the floor?

19             "Anwer:   Yes.

20             "Question:   Were you injured as a

21  result of that?

22             "Answer:   My stomach opened and I had a

23  knot in my forehead.

24             "Question:   Describe your injuries.

25             "Answer:   Well, where I had surgery

1    they opened it back up.  Right there on my forehead a

2    knot grew there.

3            "Question:  And when you struck the

4    post, describe your pain.

5            "Answer:  Pain wasn't even the word.

6    Can't describe it.  There is not a word for it.  I

7    teared up.

8            "Question:  When you hit the floor, did

9    anything happen after that?

10          "Answer:  Yes, junior officer seen it

11    was me, starting screaming out not him, hold on, not

12    him, he just had -- I'll be right down there and he

13    came running down.

14          "Question:  So did you see him running

15    down towards you?

16          "Answer:  Yes.

17          "Question:  Do you know who he was?

18          "Answer:  I forgot his name because

19    it's been so long.  He was an old man, a unit

20    officer.  There was only two of them.  He was the

21    only one.  He had been there for years.  I forgot his

22    name.

23          "Question:  Do you know approximately

24    what time of day or night it was?

25          "Answer:  It was in the morning.

1             "Question:   Early in the morning?

2             "Answer:   Wasn't early, but around

3  lunchtime, sometime around there.   They came in just

4  before lunch.   They came running in the unit.

5             "Question:   So after the unit officer

6  arrived where you were, what happened, if anything,

7  at that point?

8             "Answer:   Well one officer had the back

9  of my neck, had me laying on the floor with my hands

10  spread out.   So when he got there he said hold it,

11  let him up.   When they picked me up, everybody seen

12  that my blood just started leaking again.   They seen

13  the blood leaking through my undershirt and everybody

14  asked me what happened.   He said the man just had an

15  operation.   So they took me to the gym."

16             And then he describes his escort to the

17  gym which is uneventful, talks about being seated in

18  the gym, talks about someone with a dog approaching

19  him in the gymnasium.   And the testimony resumes in

20  the middle of page 118.

21             He says:   "And I leaned back and he

22  [the officer he's talking about] seen my shirt was

23  full of blood and called the officers and they took

24  me to the infirmary.

25             "Question:   When you arrived at the

1    infirmary, were you treated?

2              "Answer:  I was treated and sent right

3    to Saint Francis.

4              "Question:  From the infirmary?

5              "Answer:  Yes.

6              "Question:  Same night, same day?

7              "Answer:  Same day.

8              "Question:  What happened at Saint

9    Francis?

10             "Answer:  They had to restitch it and

11   put another filter in it, another drain.

12             "Question:  So it had to be restitched?

13             "Answer:  Yes.

14             "Question:  And drained?

15             "Answer:  And drained.

16             "Question:  Were you prescribed any

17   medication or anything for pain?

18             "Answer:  Yeah, they shot me up with

19   something and they were giving me pain pills,

20   codeine, whatever it was."

21             Mr. Springer then talks a little bit

22   more about his treatment at Saint Francis and the

23   instructions that took place there.  He said he was

24   at Saint Francis about three or four hours and then

25   sent back to Bayside.  He stayed in the infirmary for

1    two nights upon his return to Bayside from Saint

2    Francis and then went back to A Unit.

3            Then he said beginning at page 120:

4    "Did anything happen to you after that point?"  [Once

5    again we're now still in the vicinity of the first

6    week in August.]

7            "Answer:  Yes, I talked to Charlie

8    Ellis.

9            "Question:  Mr. Ellis?

10          "Answer:  Yes.

11          "Question:  What was your

12    understanding of Mr. Ellis' position?

13          "Answer:  He said he would look into

14    it.  He didn't say nothing else.  I didn't see him

15    after that.

16          "Question:  When you spoke to Mr.

17    Ellis --

18          "Answer:  I don't know what happened.

19          "Question:  What did you tell him?

20          "Answer:  I told him that they threw me

21    out the room head first and that they busted my

22    stomach back open.  And he said he was going to look

23    into it.  And I never heard nothing back.

24          "Question:  So you haven't heard

25    anything since?

1          "Answer:  No.

2          "Question:  From Mr. Ellis?

3          "Answer:  No, I never heard nothing

4   back from Mr. Ellis after that.

5          "Question:  How long did you suffer

6   from this particular treatment, do you know?

7          "Answer:  Well, I went back to Saint

8   Francis after that about three or four times because

9   they kept having to drain my stomach after that.

10  They said it should have healed, but it didn't heal

11  properly because they had to restitch it.  They said

12  it didn't heal properly.  So I kept having problems

13  with it.

14         "Question:  So you continued to seek

15  treatment at Saint Francis and the infirmary?

16         "Answer:  Yes.

17         "Question:  Did you complain to anyone

18  else at Bayside about what happened?

19         "Answer:  No, because I was shaky about

20  talking to anybody because of the position that was

21  going on there.

22         "Question:  What do you mean?  Were you

23  threatened?

24         "Answer:  Yeah, if you said something

25  about it, they would take care of you.  I didn't want

1    to be -- I was already jacked up.  I didn't want to

2    get jacked up even worse.

3                "Question:  Did you file an

4    administrative remedy form in this case?

5                "Answer:  No, I didn't.

6                "Question:  Why not?

7                "Answer:  Because I was told that I had

8    no reason to file one.

9                "Question:  And you said you were told.

10   Did someone tell you -- anyone specific tell you?

11               "Answer:  Yeah, I don't know the

12   sergeant's name.

13               "Question:  It was a sergeant?

14               "Answer:  Yeah, he was a sergeant then.

15   Belder.

16               "Question:  Did you say Belder?

17               "Answer:  I'm trying to think of his

18   name.  I can't think of his name.  I know it started

19   with a B."

20               That excerpt concludes at page 122.

21               There was nothing offered to refute the

22   recounting by Mr. Springer of the events which

23   occurred to him and certainly nothing, either by

24   direct evidence or by inference, that would indicate

25   that his description of this matter is inaccurate.

1                    If Mr. Springer had, in fact, been

2      fully able bodied at the time of his extraction and

3      had resisted or disobeyed any orders in terms of how

4      he was to get off of his bunk, and whether he was to

5      crawl under the bunk in order to free up a space to

6      handle other inmates and so forth, and if he was then

7      subjected to some corporal discipline for failure to

8      do that, that might be one thing.  But here is a

9      situation where the Bayside administration, and I

10     think by appropriate inference those whom they bring

11     in to help with the administration of the prison at a

12     time like this, are charged with knowledge (and

13     certainly the housing officer on the wing had actual

14     knowledge) of his physical condition and the fact

15     that he was recovering from serious surgery which was

16     administered such a very short time before.  As we

17     know, of course, the housing officer when he

18     witnessed this conduct, responded appropriately, but

19     too late.

20                    There is a doctrine in some aspects of

21     the law which says you take your victims as you find

22     them.  There is absolutely no doubt in my mind here,

23     number one, that the SOGs did not hesitate in the

24     slightest when Mr. Springer mentioned his condition

25     to them.  They chose either to ignore it or to

1    consider him a liar at the time of the events.  And

2    they proceeded to administer corporal authority, if I

3    can put it politely, on Mr. Springer with the results

4    that he described as set forth above.

5              I do find also, however, that while

6    this activity exacerbated Mr. Springer's injury, it,

7    of course, was not the sole cause of it and that

8    there is every reason to believe that he would have

9    required continuing treatment, dressing changes,

10   perhaps even problems with leakage in the future.

11   Yet some of those problems obviously are the result

12   of the actions that were taken against him and the

13   need to restitch an area that had already been

14   stitched, a circumstance that often leads to

15   difficulties.

16             I find in this case that the actions

17   taken against him here had serious sequelae, impaired

18   his healing process and exacerbated the physical

19   condition which he had, although it did eventually

20   heal and apparently presents no further ultimate

21   permanent problems.

22             Now, there was some allusion both in

23   the direct examination and in Mr. Springer's

24   cross-examination to the exhaustion of administrative

25   remedies issue.  He was examined and it was

1    determined that there were procedures available at

2    Southwoods which he could have implemented.  However,

3    I find in this case that Mr. Springer is truthful in

4    his testimony that a sergeant at Bayside advised him

5    that he didn't have to file an Administrative Remedy

6    Form in this matter.  Why that occurred, I have no

7    way of knowing, but Mr. Springer made an inquiry, was

8    told by someone in authority that he did not have to

9    file an Administrative Remedy Form and under those

10   circumstances was at least lulled into a situation

11   where he had every reason to believe that no

12   Administrative Remedy Form would be necessary.

13           Furthermore, he didn't stay at Bayside

14   very long and even though we've come to learn that

15   other institutions allow you to file ARFs regarding

16   events other than in that very prison, to wit in this

17   case Bayside, I find in this case that a person in

18   authority, a person upon whom one could reasonably

19   rely with regard to statements of this kind did, in

20   fact, advise him that no Administrative Remedy Form

21   would be needed.  Whether or not one considers this

22   in the nature of an estoppel or a waiver on behalf of

23   the defendants, in this case the seargent's statement

24   excuses the exhaustion of administrative remedies

25   that might have been available to the plaintiff, and

1    I find that that defense has not been sustained.

2              For the reasons set forth above, I find

3    that there was indeed excessive, unnecessary and

4    sadistic force imposed upon Mr. Springer here within

5    the contemplation of those legal principles.

6    However, in light of the fact that the misconduct of

7    the SOG officers here was not prolonged, was not

8    repeated, was promptly brought to a halt when the

9    housing officer advised them of who Mr. Springer was,

10   that while it is actionable for the recovery of

11   compensatory damages, I do not find that this assault

12   visited upon him rose to the level of being so

13   egregious as to support a claim for punitive damages

14   under the applicable legal standards that we are

15   employing in this case including the jury

16   instructions in those prior cases on these standards

17   for punitive damages.

18             Finally, although not every item of

19   evidence has been discussed in this opinion/report,

20   all evidence presented to the Special Master was

21   reviewed and considered.  I find that the injury

22   inflicted here was actionable.  I find that the

23   injury was acute initially and remained recurrent and

24   generated a continuing problem in terms of the

25   healing of the hernia surgery in the vicinity of his

1    abdomen.  It did not lead to continuing pain;

2    however, it did lead to immediate and acute pain and

3    also impaired Mr. Springer's activities for some time

4    thereafter.

5              Accordingly, I recommend in this report

6    that the district court enter an award of

7    compensatory damages in the amount of 12 thousand

8    dollars in Mr. Springer's favor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Theresa O. Mastroianni, a Notary Public and

4     Certified Shorthand Reporter of the State of New

5     Jersey, do hereby certify that the foregoing is a

6     true and accurate transcript of the testimony as

7     taken stenographically by and before me at the time,

8     place, and on the date hereinbefore set forth.

9          I DO FURTHER CERTIFY that I am neither a

10    relative nor employee nor attorney nor counsel of any

11    of the parties to this action, and that I am neither

12    a relative nor employee of such attorney or counsel,

13    and that I am not financially interested in the

14    action.

15

16

17

18

19    _____

20    Theresa O. Mastroianni, C.S.R.
      Notary Public, State of New Jersey
21    My Commission Expires May 5, 2010
      Certificate No. XIO857
22    Date: November 18, 2008

23

24

25